Thomas J. BEVAN, Appellant,

v.

Mary Margaret BEVAN, Appellee.

No. 12901.

Court of Civil Appeals of Texas.

San Antonio.

Sept. 28, 1955.

Rehearing Denied Oct. 26, 1955.

Fischer, Wood, Burney & Nesbitt, Corpus Christi, for appellant.

Lewright, Dyer, Sorrell & Redford, J. McCollum Burnett, Corpus Christi, for appellee.

POPE, Justice.

This suit is for permanent child custody. Whether the Oklahoma Courts or the Texas Courts have jurisdiction over two minor children is the controlling question in the case. We conclude that Oklahoma had jurisdiction and never lost it, and for that reason the judgment of the Texas Court is reversed.

Thomas J. Bevan, appellant, and Mary Margaret Bevan, appellee, were married in 1938. Two boys were born of that marriage, and they are the subjects of this suit. From 1943 to July, 1954, the mother, father and children continuously lived in Tulsa, Oklahoma. Carl, now thirteen, lived there from the age of eighteen months and Samuel, now ten, was born there. The parents were divorced on October 18, 1951, by the District Court of Tulsa County, Oklahoma. The mother obtained custody of the children except for week-ends visits by the father. After her divorce, the mother continued to reside in the family home in Tulsa. The father remarried on April 4, 1953, and one child was born of that marriage.

On August 18, 1953, the Tulsa Court entered a new order. It recited the personal appearance of both parents, a trial, the hearing of evidence. It concluded that both parents are fit and proper parents and will afford proper accommodations for the children. It recited, that by reason of the age of the sons "and the circumstances shown by the evidence, the children are in need of and will continue to need the guidance, counsel and training of both parents," and that custody should be altered. The father was given custody yearly from July 1 to Christmas vacation, and the mother was awarded custody from Christmas vacation to June 30. The details of weekly visits were also specifically stated. The mother appealed to the Oklahoma Supreme Court, and additionally petitioned that court to enjoin the District Judge and the father from enforcement of the order for custody until the Supreme Court decided the appeal. That petition was argued by the mother's and father's attorneys before the Oklahoma Supreme Court, 274 P.2d 398, and on September 4, 1953, the mother's prayer for the stay order was granted.

While the case was pending before the Supreme Court, the mother on May 29, 1954, filed a motion before the District Court of Tulsa County for permission to take her children on a visit to Texas and Mexico, and swore that she would return the children to Tulsa on September 1, 1954. The father then petitioned the Supreme Court of Oklahoma to dissolve its stay order and permit him to have custody as formerly decided by the trial court, for the reason that the mother was preparing to take the children from the State. The mother answered in the Supreme Court under oath and asserted that she desired only to take the children to Texas and Mexico "as a recreational and educational summer tour." She repeated the sworn assertion that she desired to take the children on a vacation, "but not for the whole summer." She asserted that she would not in-

terfere with the father's two weeks, "as provided in the contract and the decree." There was no adjudication of the application to take the children out of Oklahoma, nor of the petition that the Supreme Court dissolve the stay order.

The father took the children on a two weeks vacation and returned them to the mother on July 11. The mother at that time was planning to leave for Texas, and did so leave the next day. On July 13 she was in Austin, Texas, and on that same date the Oklahoma Supreme Court affirmed the District Court's judgment dividing custody of the children. On July 16 or 17 the mother was in Kingsville, Texas, and there learned that she had lost her appeal. According to her, when she talked with her mother and sister in Kingsville, and learned about her unsuccessful suit, she decided not to return to Oklahoma. She phoned her Oklahoma lawyer and they talked about a motion for rehearing, which the attorney filed. The next day she consulted a Texas lawyer, who told her she could not enter the Texas Courts. She thereupon wrote her Oklahoma lawyer to send all her stocks, bonds, money and personal articles to her in Texas. She listed her Tulsa home for sale. While she was doing these things, the Oklahoma attorney filed her motion for rehearing in the Supreme Court of that State, and it was finally overruled by the Court on September 29, 1954.

Before the Oklahoma procedure had run its course, on September 29, the mother commenced a suit in Texas on August 25. She served the father with process on September 1, that being his first information that she intended to stay in Texas. The father challenged the jurisdiction of the Texas Courts. The Texas Court, after hearing, granted the mother temporary custody.

The father, having won the custody case in Oklahoma by final judgment on September 29, 1954, then turned to the Oklahoma District Court for enforcement of its order. He applied for and obtained an order that the mother appear and show cause why she was not in contempt. When the mother was served on October 16 in Texas she immediately consulted her Texas lawyer. That same day she conveyed her Tulsa home to her mother to defeat a possible levy arising out of a contempt judgment. The mother's Oklahoma attorney was also served with a show cause order and he appeared on October 20 and defended the suit on his behalf and on behalf of Mrs. Bevan. A further hearing was conducted in early November. The court found Mrs. Bevan in contempt and recited in its decree that she had represented to the court that she would return the children to Tulsa after the vacation trip to Mexico; that she, in open defiance of the court's order, which had been affirmed by the Supreme Court, wrongfully and without permission of the court, removed the children from the custody of the court, and that she had violated the Tulsa Court's order that the father could have week-end visits.

The next development in this sequence of events was that the mother advised her Oklahoma attorney by telegram that he had no authority to appear for her in the contempt matter. She reached that conclusion only after an adverse judgment. Her Oklahoma attorney then withdrew as counsel and submitted to the court the question of his authority. The Oklahoma Court found he had general authority on her behalf.

Amid this array of resourceful interferences with the orderly processes of courts and the law, Mrs. Bevan raises the plea that she was a domiciliary of Texas since about July 16, 1954, and at the time she called upon the Texas Courts and judges to hear her plea of changed circumstances entitling her to a new custody order.

■ The Supreme Court, recognizing the confusion among cases about the jurisdiction between States over custody, has stated certain rules of practical import. Domicile and the presence of the child and parties before the court are important, but even those concepts have importance only in a general way. Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876, 878, 4 A.L.R.2d 1. The rules there announced declare that, even as-

suming jurisdiction exists, Texas Courts should not always take it. We find no other meaning in these words:

"The foregoing does not, of course, mean that our courts should take jurisdiction to award custody in every case where the child and the parties contending for its possession happen to be here before the court. Nor does it mean that a child's foreign legal domicile is not an important consideration in cases of this kind. We certainly do not imply that our courts should be accessories after the fact to disorderly practices of individual parents or others who thus seek to avoid the normal processes of justice by ex parte determination of what they happen to consider a more propitious forum." Wicks v. Cox, supra.

Worden v. Worden, 148 Tex. 356, 224 S.W.2d 187, 190, again emphasizes the importance of practical considerations when it declares:

"Whether our courts have and will exercise jurisdiction depends in part upon domicile and also upon broader considerations, including among other things the physical presence before the court of the child and the contesting parties, and the general situation affecting the ability of the court to form an intelligent judgment on what will be best for the child's welfare."

Texas Courts, from these authorities, may take jurisdiction when, among other considerations, to do so will "involve no particular prejudice to good order or social welfare," and when our courts "are in a more or less equally good position to determine the child's best interest." Wicks v. Cox, supra.

■ The mother of these children has become, in fact, the Supreme Court, if she successfully establishes this precedent that today's judgments are vacated the same day by a precipitant move beyond the borders. The mother presented her case before the Oklahoma Court, admittedly having jurisdiction, she appealed to the Supreme Court of that State, she sought and obtained a stay order so she could continue to enjoy the rights that existed before the trial court changed the custody provisions. When it was suggested to the trial and Supreme Courts of Oklahoma that she contemplated moving beyond the jurisdiction, by sworn pleadings, she protested her innocence, which protestations both courts apparently believed. When she lost her case before the Supreme Court, within twenty-four hours, she, then in Texas, mentally determined that there she would stay. But she again turned to the Supreme Court of Oklahoma by motion for rehearing. Before the Court ruled and before the mandate issued, she filed a new suit in Texas, contending that Oklahoma had no jurisdiction over her. If custody judgments are vacated in this summary and extra-legal fashion, there is no law. We do not consider it conducive to good order for Texas Courts to assume jurisdiction over those who flee from the orderly process of a court which already has jurisdiction. Particularly is that true, as here, when Texas relief was sought while the Oklahoma suit was still active and pending by her own appeal.

■ We come now to the next issue: Is the Texas Court in a more or less equally good position to determine the child's best interest? The trial court found as a fact that "the undisputed facts adduced in evidence at the trial" show that the Texas Court "is in a better position to determine such issue * * * than is the District Court of Tulsa." We have read the record, and the undisputed facts are that for ten years both parents have lived continuously in Tulsa, that one child had always lived there, and the other had been there since the age of eighteen months. To the date of the move, the children had never attended school, Sunday School, or church, other than in Tulsa. They had no friends elsewhere. Because both parents had their homes and friends in Tulsa, the Tulsa Court had already considered the custody problem five different times and had a pending decision before the Supreme Court. Upon the trial of the case in Texas, not a single witness from Texas testified. To prove change of

conditions, it became necessary for the mother to bring a medical witness and a neighbor from Tulsa. To dispute her proof, the father resorted to deposition testimony of other persons from Tulsa. On each of the claimed changed conditions, the issues were disputed, except for the fact that the children were then in Texas schools and doing satisfactorily. This fact was proved by the mother only and not by other Texas witnesses, and would be as easily comprehended by a judge in Tulsa as in Kingsville, Texas. The undisputed record, contrary to the finding, is that the Texas Court was not in so good a position to determine the matter as was the Tulsa Court, and for that reason should not have assumed jurisdiction.

■ There was no material change of conditions. All parties are admittedly fit and proper persons. The Tulsa Court, by its August 18, 1953, order determined that the two children should receive more of their father's custodial protection and guidance and less of their mother's, and changed its former order so the father would have custody six months each year rather than visiting rights only. The emotional stability of the children, a claimed increase of bitterness between the parents, and the matter of religious instruction, were all issues before the Tulsa Court at that time. Those same issues are now presented in the form of new incidents which occurred between August 18, 1953, and the time of the mother's departure for Texas. The Tulsa Court, which had so often been confronted with their problems, apparently believed that the fault in those matters lay less with Mr. Bevan than with the mother. The court refused to follow the mother's complaints and instead gave the father greater rights.

The facts do not support the trial court's findings. Bitterness there may be, but the fault does not lie with the father, from this record. Despite a court order for the father's custody of six months, the children have not spent a night in the father's home since August 18, 1953. Despite a court order that the father should have week-end visiting rights, the proof is that, commenc-

ing immediately after August 18, 1953, the mother at will disregarded that court order. Dr. Stovall, a neighbor and witness for the mother, testified that he knew of no bitterness on the part of the father. Mrs. Stovall testified to one incident when the father presented himself at her home and loudly insisted that the children be delivered to him. That incident occurred on Sunday when the father had custody rights. The mother, contrary to that right, had instructed the children to slip out the back of church to avoid the father, and had then taken them to dinner at the Stovalls. This was an open violation of the express terms of the court order. Another incident was the father's displeasure when the mother interfered on a Saturday when he planned to take his child to a Cub Scout ceremony at a time when again he was entitled to his custody. The mother testified that commencing after August 18, 1953, she would refuse to surrender custody of the children because the father took the children on occasions to a church not of her choosing. She admitted that she refused to obey the Tulsa Court decree on those occasions. The record shows that she undertook to police his custody even while he had it. She laid down conditions to surrendering the children to him, based on whether he provided a baby-sitter on one occasion, and the proper care of clothing on another, and how late the children should sleep on another.

Mr. Bevan has never been charged with violating the custody decree. Mrs. Bevan has repeatedly ignored the custody order and has imposed conditions not found in the Tulsa decree. Her interference with the court order is at the bottom of the trouble between the parties. The Court finds that there were disturbances after August 18, 1953. We find further from the record that the mother provoked them by repeated frustrations of the existing court orders.

The court found as a fact that a change of conditions occurred because the father takes the children to the Unitarian Church, instead of to a Methodist Sunday School. For that reason the children are taken from the father. That matter was considered by the Tulsa Court when presented to it in Au-

gust, 1953. Moreover, the most that the proof shows is that on three occasions the children missed Sunday school to attend special services at the Unitarian Church, and had been inside the Unitarian Church only six or eight times. We find no evidence that the children are disturbed by the visits. In any event, we must strike down the finding as an attempt by a branch of the State to determine what religion is for the best interest of persons. Secular judges possess no religious powers and enforce no religious preferences. Salvaggio v. Barnett, Tex.Civ.App., 248 S.W.2d 244; Reynolds v. Rayborn, Tex.Civ.App., 116 S.W.2d 836; 1st Amendment, U.S.Const.; Secs. 4, 5, 6, art. 1, Texas Const.Vernon's Ann.St.

The court found as a fact that prior to the last Tulsa Court hearing, the children were "somewhat" emotionally unstable and that the condition increased from that time up to the time the mother moved them to Texas. We find five instances when the children were upset, particularly the younger one. One instance was the evening after the Tulsa Court ruled, when the mother charged one of the children with originating the idea that they stay with each parent for six months, which was accepted by the Tulsa Court. We may wonder what other reaction by the child the mother expected when he was so confronted. The evidence was offered on a bill and should have been admitted in evidence. Another instance was when the mother, while in Texas, advised them the Supreme Court had affirmed the Tulsa Court. Another instance occurred when the younger child at the mother's home was hysterical. In no way did the testimony connect his condition with the father. The younger child called his mother from the father's home on one occasion because he wanted to come home. He complained that his father was angry with him. Still another occasion was when the father refused to purchase a footbal pin with which to pump up a football. On both of the last mentioned instances, the children were adjusted by the time they returned home. The only medical witness who testified, stated that the children were upset, but it was "minimal." All of the testimony shows that the children were happy during their visits in the father's home.

But the most surprising finding is the one wherein the court stated that the birth of a new baby to the father and his second wife would result in a diminution of love for his two sons. This finding was not stated as the situation in fact, but as an abstract principle. Other than to repudiate such a finding, we refuse to comment.

Finally, the court found as a fact that a change of schools resulted in a changed condition. The mother insists that we should not now move the children from familiar classes, friends, associations, neighborhoods—the very thing she did when she moved them from Oklahoma to Texas. The weight of the evidence supports the trial court's finding that the children are adjusted and doing better in school than when they resided in Tulsa. This is the only finding of changed conditions which we believe is supported by the evidence. The others are either immaterial, already passed upon by the Tulsa Court, or against the overwhelming weight of the evidence.

We conclude that (1) the Texas Court in assuming jurisdiction encouraged * * "disorderly practices of individual parents or others who thus seek to avoid the normal processes of justice by ex parte determination of what they may consider a more propitious forum," (2) the Oklahoma Court, already holding active jurisdiction of the case, was in a better position to determine the children's best interest than was the Texas Court, and (3) there have been no material changes of conditions since August 18, 1953.

The judgment is reversed and the cause remanded to the trial court with instructions to enter the necessary orders to cause the delivery of the children to the father. Raymond v. Updegraff, Tex.Civ.App., 255 S.W.2d 595.