Reinhardt L. FRANTZEN, Appellant,

v.

Betti Rose FRANTZEN, Appellee.

No. 13809.

Court of Civil Appeals of Texas.

San Antonio.

Sept. 20, 1961.

Petsch & Petsch, Dooley & Hoerster, Fredericksburg, for appellant.

Joe D. Prickett, San Antonio, for appellee.

BARROW, Justice.

The following statement of the nature and result of the suit, as well as the material allegations of plaintiff's petition, is copied from appellant's brief:

"This suit was filed in January, 1959, wherein Appellant sought a divorce and the custody of the children of the marriage—boys—one born on March 28, 1955, and the other August 28, 1957. Exceptions to husband's—Appellant's—Petition were sustained and the cause dismissed on January 14, 1961; to this Decree Appellant excepted in open court and gave Notice of Appeal * * *.

"The parties were married January 24, 1953, and up to the development of the controversy culminating in this suit, they lived in harmony and worked enthusiastically in their determination to provide security for the family and most especially to give the boys such education and training advantages as were calculated to develop them as moral, substantial and patriotic citizens. Accordingly, both parties joined the same Church, the Junior Chamber of Commerce, participated in political affairs, the Defendant becoming the Woman Chairman of the Women's County Republican Organization, and Plaintiff—especially with a view of impressing the sons with the importance of the organization—became a Boy Scout Leader. Thus, by both precept and example, the parties were engaged in doing their utmost to encourage the children to become intelligent, patriotic citizens, taking part in the affairs of Government and ever ready to defend the Nation from attack by those who would destroy it from within or without. * * *

"The first challenge to the aspirations of the family presented itself to Appellant on a night in April, 1958, when upon his return from a Scout Meeting, he found Appellee in company with—apparently engaged in a conference, known as a 'Study Session'—with three members of the local Jehovah Witness Organization. As soon as the parties to the cause were alone, Appellant expressed his apprehension to Appellee and requested her to desist in further studying with the group. Appellee refused, claiming Appellant's apprehension unfounded and insisted that Appellant meet with the Appellee and the local Jehovah Witness leader—'Pioneer'—so as to become informed of the true purposes of the Jehovah Witnesses. * * * In this meeting, the Appellant was informed by the Pioneer, Jehovah Witnesses believe and advocate that: (a) 'All world governments are ruled by the devil', (b) for such reason Jehovah Witnesses refuse to take part in any governmental activities such as voting, offering for public office, service on juries, refuse to salute the Flag and to pledge allegiance to any Nation; (c) refuse to serve in the Armed Forces, even to defend the Country against an aggressor who would enslave our people; (d) theirs, the religion of the Jehovah Witnesses, is the only true religion and only a select few are permitted to go to Heaven, (e) Jehovah Witnesses refuse to permit their children to join such character-building and patriotic organizations as Boy or Girl Scouts, Young Men's and Young Women's Christian Associations, (f) refuse to grant permission for the administration of blood transfusions even in case of severe illness involving the danger of loss of life; (g) and the Jehovah Witness beliefs and doctrines are so strong that unless both husband and wife are cobelievers, divorce will as a general rule result.

"As a result of the discussion immediately following this meeting, the Appellee in the interest of the children agreed to remain away from the Study Sessions and the family continued to live happily together. * * *

"About the middle of August following—at the near-midnight return home—Appellee admitted that she had broken her promise, had been secretly attending the Study Sessions and stated she was a convert to the doctrines of the Jehovah Witnesses. Instantly, Appellant envisioned a wrecked home and the most terrible impositions which were going to be visited upon the helpless sons—subjecting them to embarrassment during their youth, and if, upon becoming devotees, to Appellee's teachings, being deprived of the opportunities available to normal American boys, and instead be-

coming absolutely useless to their community and valueless to the Nation which had made available to them the greatest opportunities afforded in any country in the world. The contemplation of these misfortunes for the sons caused Appellant to lose his self-control, and he appealed and begged Appellee over and over to change her course for the sake of the two sons. Appellee finally once more agreed to sever her relations with the 'Study Session Group'. And Appellant having full confidence in Appellee's promise, the family once more lived happily—Appellant being entirely confident of Appellee's good faith and that the family's ambitions for the two sons would be fulfilled. * * *

"On the following October 17th—being the day following a night when Appellee on leaving home had stated she was going to 'visit a mutual friend'—at the noon meal, the son Kurt announced, 'Mom and I went to class last night.' Being suddenly confronted with Appellee's apparent deliberate deception and her broken promises—under an immediate uncontrollable impulse—Appellant forcibly took both children from Appellee annd carried them to her parents in San Antonio. Returning home with the children the next day, Appellant begged Appellee to return with him to her parents and her sister in the hope they might render effective assistance to Appellant. He also finally persuaded the Appellee to discuss the family situation with the Minister who had performed their wedding ceremony, with the Minister of their Church, with a 'Marriage Counselor', with the Family Doctor, and with several other mutual friends—all without avail—as equally was every other appeal by Appellant. * * *

"These efforts at persuading Appellee to change her course, were continued without success during the months of October, November and December. Appellee remained adamant in her position. All the time Appellant was constantly conscious of the certain impositions which would be visited upon the children if they were to remain under Appellee's influence, and the possibility of either or both unnecessarily losing their lives in case of severe illness because of Appellee's commitment to refuse to permit blood transfusions. As these thoughts were constantly with Appellant, he suffered loss of sleep, appetite and serious impairment of his health to the extent as to render the further living together with Appellee absolutely insupportable. His only remaining recourse for the children's protection was the law. He filed this suit."

The petition in this case alleged no overt acts of cruel, harsh, or unkind treatment that the law recognizes as being of such a nature as to render appellant's further living with appellee insupportable. It is apparent from the allegations that appellant's suffering is entirely mental and emotional and brought about by a difference of religious faith and belief. While we are unable to comprehend any religious faith that would regard allegiance and patriotic service to one's country as in any way repugnant to one's religious belief, nevertheless, the right to such religious belief is protected by the Constitution of the United States as well as this State, so long as the teachings and practice of such religious belief are neither immoral nor illegal. The Courts have no more power to enforce by decree a conformance to certain religious teachings and practices than does the Legislature to establish a national or state religion by law. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. The Courts of this State have repeatedly and consistently held that differences of the spouses in religious faith, teaching and practice are not grounds for a divorce in this State. Bevan v. Bevan, Tex.Civ.App., 283 S.W.2d 305; Salvaggio v. Barnett, Tex.Civ.App., 248 S.W.2d 244; Reynolds v. Rayborn, Tex.Civ.App., 116 S.W.2d 836; Hickman v. Hickman, Tex.Civ.App., 10 S.W.2d 738; Haymond v. Haymond, 74 Tex. 414, 12 S.W. 90. Moreover, one's religious beliefs, teachings and practices are not grounds for depriving a parent of his or her chil-

dren, so long as such teachings and practices are neither immoral nor illegal. Appellant has cited no authorities to the contrary, and we have found none. The trial court correctly sustained the exceptions to plaintiff's petition, and upon his refusal to amend properly dismissed the suit.

The judgment is affirmed.