Irene A. ALANIZ, Appellant,

v.

Frank ALANIZ, Appellee.

No. 08–93–00190–CV.

Court of Appeals of Texas,
El Paso.

Nov. 3, 1993.

Gordon Stewart, El Paso, for appellant.

Brenda J. Norton, Robles, Coffman & Hughes, L.L.P., El Paso, for appellee.

Before OSBORN, C.J., and KOEHLER and BARAJAS, JJ.

## OPINION

OSBORN, Chief Justice.

This appeal raises the question of how to deal with "the best interest of children" in a custody dispute and the rights of the parties under the Bill of Rights in the United States Constitution and the Bill of Rights in the Texas Constitution. The Appellant claims she lost custody of her three sons in a jury trial because of her religious beliefs as a Jehovah's Witness.[1] We reverse and remand.

---

1. This is not the first time this claim has been made in this State. *See Salvaggio v. Barnett,* 248 S.W.2d 244 (Tex.Civ.App.—Galveston, writ ref'd n.r.e.), *cert. denied,* 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952); *Reynolds v. Rayborn,* 116 S.W.2d 836 (Tex.Civ.App.—Amarillo 1938, no writ).

*Facts*

Frank and Irene Alaniz were married in 1976. Three boys were born of this marriage. Both parties filed for divorce in 1991. The case was tried to a jury in January 1992 and a final judgment was entered in April 1993 based upon the jury findings that Frank should have custody of all three boys.

There was no dispute that both parties were conscientious and loving parents. There is no testimony seriously disputing either parent's ability to nurture the children. Given the undisputed fact that both parents would meet the children's basic needs, the question presented is whether the intrusion into Mrs. Alaniz's right to religious freedom was justified by Mr. Alaniz's claims that in order to fully inquire as to what is in the "best interests of the children," full examination must be made into the mother's religious "lifestyle" and further, if such intrusion is justified, what instructions must be given to a jury in order to insure that such religious freedom remains inviolate.

The record demonstrates that the major issue in this case was the effect that Mrs. Alaniz's religious practices would have on the children if the court granted custody of the children to her. Mrs. Alaniz had recently converted to the Jehovah's Witness religion and her husband remained a member of the Roman Catholic Church.

Prior to trial, the court granted a Motion in Limine which in effect prohibited the introduction of evidence upon issues of the religious upbringing or training of the children and the identity of any religion, or religious doctrines, beliefs, traditions, or practices.

The beliefs of members of the Jehovah Witness Organization were set forth by Justice Barrow in *Frantzen v. Frantzen*, 349 S.W.2d 765 (Tex.Civ.App.—San Antonio 1961, no writ). Among other things they (1) refuse to serve in the Armed Forces, (2) refuse to salute the flag, (3) refuse to say the pledge of allegiance, (4) refuse to authorize the giving of blood transfusions, and (5) refuse to celebrate birthdays and Christmas.

During *voir dire* examination, counsel for Mr. Alaniz was permitted to ask the jury panel if anyone "would refuse to consent to a blood transfusion in a medical emergency for their children?" Counsel for Mrs. Alaniz stated during *voir dire* that his client was a Jehovah's Witness and asked questions about religious preferences. The trial court ruled that this procedure "opened the door" on the religious preference, thereby terminating the Motion in Limine.

Mr. Alaniz testified that he filed suit for divorce when his wife informed him that she was going to start taking the boys to the Kingdom Hall and that she felt it was her duty to have them converted into Jehovah's Witnesses. Mrs. Alaniz testified that she had never tried to force the children to make a decision about joining her church. She did acknowledge that as a parent, she was obligated to teach her children good moral values. She said that she did not interfere with the children's activities at school where they celebrate Christmas, birthdays, and other holidays. She said she had an obligation to teach her children about her faith, just as her husband had an obligation to teach them about Catholicism.

Karen Gold, Doctor of Clinical Psychology, had counseled with both the parents and the children. She was of the opinion that the father should be the managing conservator, but that the children should reside during the school week and on all nonreligious holidays with their mother.[2] She described Mrs. Alaniz as "an excellent mother" who she said has "very definitely" done well by her children academically and otherwise. She also testified:

> I felt that the children should live with her through the school week and they should

---

2. Dr. Gold in her testimony stated that Mr. Alaniz was better equipped to help the children understand and effectively use leisure time. She stated that her opinion was not based solely because of religious preferences but on "the children's oft-repeated comment that mom is very good at taking care of them, but dad is much better at playing with them, and that also, that mother asks them to do certain things that make them uncomfortable." Should it not be expected that dads would be better at playing with boys as they get older? Or that a working mother may have little leisure time after a day at work?

be with their father during the religious holidays. They should be with her during the holidays after the religious observance is made, and that she certainly should have vacation time from her teaching job with the children to spend at leisure, but that I also felt that their father should make decisions as far as their medical care.

### Jury Instruction

The court in its charge instructed the jury with regard to the question of religion as follows:

The State cannot prefer the religious views of one parent over the other in deciding the best interest of a child.

The Appellant objected to the instruction given and requested the following instruction:

A parent's religious beliefs, teaching, and practice are not grounds for depriving a parent of managing conservatorship unless the teaching or practice of the beliefs are illegal, immoral, or demonstrate to be harmful to the child or children.

### Decision

■ Although the issue over religious beliefs was not tried with the same fervor as in *Marriage of Knighton*, 685 S.W.2d 719 (Tex. App.—Amarillo 1984, no writ) and again 723 S.W.2d 274 (Tex.App.—Amarillo 1987, no writ), the issues are much the same. The real issue in deciding what is in the best interest of a child or children is whether the religious beliefs, teachings, and practices of the parents constitutes relevant evidence and if so, how should the jury be instructed to consider that evidence without doing violence to a party's rights under the constitutional guarantees of religious freedom. The answer becomes more difficult if one recognizes that the particular beliefs, teachings, and practices are not part of the "main stream" religious practices where the case is tried. Certainly, the beliefs of Jehovah's Witnesses could not be classified as the beliefs of "main stream" religious denominations in El Paso County or even anywhere in the United States.

The belief of the Jehovah's Witnesses that one should not salute the flag was an issue as to a father's custody of his daughter in *Reynolds v. Rayborn*, 116 S.W.2d 836 (Tex.Civ. App.—Amarillo 1938, no writ). Chief Justice Jackson wrote:

The flag is emblematic of the justice, greatness, and power of the United States—these, together, guarantee the political liberty of the citizen, but the flag is no less symbolic of the justice, greatness, and power of our country when they guarantee to the citizen freedom of conscience in religion—the right to worship his God according to the dictates of his conscience. Beyond my comprehension are the vagaries of people who claim and accept the protection of their government in order to worship God according to the dictates of their conscience, but refuse to salute their country's flag in recognization of such protection. Yet, however, [sic] reprehensible to us such conduct may be, their constitutional right must be held sacred; when this ceases, religious freedom ceases.

116 S.W.2d at 838–39.

In *Salvaggio v. Barnett*, 248 S.W.2d 244 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.), *cert. denied*, 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952), the father was considered to be a fit and proper person to have the custody of his daughter, except that he proposed, based on his religious beliefs, to teach her that it is wrong to salute the American Flag, and that it is wrong to celebrate and exchange gifts at Christmas, and that it is wrong to kill in defense of one's country. The Court said:

Under the American principle of separation of Church and State, the secular power is so shackled and restrained by our fundamental law that it is beyond the power of a court, in awarding the custody of the child, to prefer, as tending to promote the interest of the child or surround it with a more normal atmosphere, the religious views or teachings of either parent.

*Id.* at 247.

The Court noted in that case that it was not contended that the father's religious teachings to his child would be immoral or

illegal, but merely that they would be unpopular.

In citing those and other opinions by courts of this state, in *Frantzen v. Frantzen*, 349 S.W.2d 765 (Tex.Civ.App.—San Antonio 1961, no writ), Justice Barrow said that one's religious beliefs, teachings, and practices are not grounds for depriving a parent of his or her children, so long as such teachings and practices are neither immoral nor illegal. That standard was reiterated in *Matter of Marriage of Knighton*, 723 S.W.2d 274, 278 (Tex.App.—Amarillo 1987, no writ). In that case, Justice Boyd wrote:

> Thus, it is beyond the power of a court, in awarding the custody of a child or children to prefer the religious views or teachings of either parent, even though the beliefs and practices of one parent might be more 'normal' or more in accord with majority religious views or practices.

■ Accepting the principles set forth in the cited cases and recognizing that a parent's religious beliefs, teachings, and practices are not grounds for depriving a parent of custody of his or her children if those beliefs, teachings, and practices are not immoral or illegal, did the court's instruction in this case instruct the jury on that fundamental constitutional right to religious worship and practices which some jurors might consider unusual or abnormal? We conclude the answer is "NO."

3. While evidence may be admitted about a parent's general philosophy of childbearing and how their religious beliefs and practices affect "the best interest" of the children, there should be no attack upon or questioning of a party's theology.

4. Upon retrial of the case, the trial court should give a substantially correct instruction to the jury concerning the manner in which they should consider any evidence of the party's religious beliefs, teachings, and practices. In order for a party to be able to appeal any adverse finding and have the appellate court evaluate the jury's findings, it seems advisable to submit a question which inquires if the jury recommendation as to who should be appointed as managing conservator is based in part upon the religious beliefs, teachings, and practices of the party not so recommend. And if so, a checklist inquiring as to whether the jury concluded that such the beliefs, teachings, or practices of the adversely affected party was either illegal, immoral, or harmful to the child. By way of example:

■ The State was not a party to this suit. The instruction should have dealt with the rights of the parties before the jury based upon the evidence which had been admitted. There was evidence about the religious beliefs of the mother, but no standard was given to the jury on how to consider those beliefs when considering what was in the best interest of the children. The requested instruction was substantially correct. The jury should have known that the beliefs which the jury might have considered unusual were not grounds for depriving her from being named managing conservator unless they concluded that her beliefs, teachings, or practices were illegal, immoral, or would be harmful to the children.[3] If they concluded those beliefs, teachings, or practices were either illegal, immoral, or harmful rather than just unusual or abnormal, they would be considered, otherwise they would not. The holding in *Frantzen v. Frantzen*, 349 S.W.2d 765, which affirmed a judgment based upon special exceptions to the pleading, is that the religious beliefs, practices, and beliefs of Jehovah's Witnesses are not immoral or illegal. We conclude that what is immoral or harmful should be left to the jury to apply community standards. What one jury might consider immoral, i.e. gambling, playing a lottery, drinking to excess, homosexual conduct, or abortion,—another jury might not.

We sustain Points of Error Nos. One and Two.[4]

> You are instructed that a parent's religious beliefs, teachings, and practices are not grounds for depriving a parent of managing conservatorship unless the beliefs, teachings, or practices are illegal, immoral, or demonstrated to be harmful to the child or children.
> 
> JURY QUESTION NO. _____
> Who should be appointed managing conservator of the children named below?
> Answer by naming "Mr. Smith" or "Mrs. Smith"
> 
> Susie Lou Smith _____
> 
> Billy Bob Smith _____
> Have you, under the court's prior instruction, considered the religious beliefs, teachings, and practices of the party who was not recommended as managing conservator in answer to the foregoing question?
> Answer "Yes" or "No": _____

The next contention is that the trial court erred in instructing the jury that a parent appointed sole managing conservator of a child retains all the rights, privileges, duties, and powers of a parent to the exclusion of the other parent and that such rights, privileges, duties, and powers include "The right ... to direct the moral and religious training ... of the child." The Appellant quotes from the comment in 5 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 215.01 (1989) where the committee expresses no opinion on the propriety of such instruction. We need not pass on this issue. We have sustained points that require a reversal. Upon retrial, the court will be governed by the Family Code as amended by the last legislature. The new provisions in Section 14.02(b)(1)(A) provide that a parent appointed as a conservator of a child retains the rights, privileges, duties, and powers of a parent including the right "to direct the moral and religious training of the child". HB 1630, 73rd Leg., R.S., Ch. 766, § 2, 1993 TEX.SESS.LAW SERV. 2992 (Vernon) (to be codified as TEX.FAM.CODE ANN. § 14.-02(b)(1)(A)). This right is subject to any limitation imposed by court order. HB 1630, 73rd Leg., R.S., Ch. 766, § 2, 1993 TEX. SESS.LAW SERV. 2992 (Vernon) (to be codified as TEX.FAM.CODE ANN. § 14.02(a) and (b)).

The last point of error asserts the trial court erred in admitting evidence, over timely objections, as to the religious practices of Mrs. Alaniz. In view of our disposition of the other points of error, we need not consider each of some twenty complaints about evidentiary ruling. As noted earlier, counsel for Mrs. Alaniz first raised the issue as to her religious beliefs and caused the trial court to hold that the "door was open" on this issue in the case. We need not decide if counsel for Mrs. Alaniz did "open the door" by his questioning of the jury panel. That may not happen on retrial. Counsel for both parties and the trial court have a responsibil-

ity to see that the case is tried within the guidelines of our state and national constitutions and to make certain that no parties' rights are violated while reaching the difficult issue of what is in the best interest of the children. That lesson was not learned in the first trial in *Matter of Marriage of Knighton* and a second reversal required a third trial. We do not anticipate such results in this case.

The judgment of the trial court is reversed and the case is remanded for a new trial.

If you have answered the foregoing question "Yes" then and only in that event, answer the following question.

Were such religious beliefs, teachings, and practices of that party considered to be one or all of the following:

Answer "Yes" or "No":
Illegal _____
Immoral _____
Harmful _____