PER CURIAM.
C.L.B. (“the mother”) appeals from a judgment awarding D.L.O. (“the father”) and her joint physical custody of their child. Pursuant to the judgment, the child is to spend alternate weeks with each parent.
This is the second time this cause has come before this court. In the first appeal, C.L.B. v. D.L.O., 42 So.3d 1246 (Ala.Civ.App.2010), this court considered the propriety of the judgment of the Winston Juvenile Court entered on June 3, 2009. In that judgment, the juvenile court found that the child was dependent because he was in a condition or surroundings that endangered the child’s morals, health, or general welfare. Based upon its findings, *327 the court modified primary custody of the child from the mother to the father. We determined that the finding of dependency was not supported by clear and convincing evidence and that, because the child was not dependent, the juvenile court had applied the incorrect standard in determining whether a custody modification was warranted. Id. at 1249-50. Accordingly, we reversed the judgment and remanded the cause for the juvenile court to apply the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), to determine whether to modify custody. Id.
On February 17, 2010, after this court had remanded the action, the father filed a motion for “temporary” (properly, penden-te lite) custody of the child pending the juvenile court’s new custody determination. The next day, February 18, 2010, the mother filed her opposition to the father’s motion for pendente lite custody. The case-action summary indicates that the juvenile court entered a “temporary order” on February 18, 2010, awarding the father temporary custody .of the child until the juvenile court could make a new custody determination. We note that, although it was entered on February 18, 2010, the “temporary order” was dated February 17, 2010, before the mother’s opposition to the father’s motion had been filed. No appeal was taken from the “temporary order.”
On April 29, 2010, the juvenile court entered an “amended final order” (“the amended judgment”) based on the evidence presented at the May 7, 2009, trial— the same evidence it had relied on in entering the judgment of June 3, 2009. In that amended judgment, the juvenile court set forth new findings of fact. It stated that “[t]he testimony and evidence presented [at the May 7, 2009, trial] was such as to convince this court that a change in custody will materially promote the minor child’s best interest and that the benefit(s) derived from the change in custody will more than offset any disruptive effect caused by said change in custody.” The juvenile court then awarded the parties joint physical custody of the child, “with each party exercising visitation every other week for a period of seven (7) days.” The juvenile court instructed the parties to “exchange the minor child every Friday at 6:00 p.m.,” but it also granted the mother visitation every other weekend from Friday evening until Sunday evening. It appears from the amended judgment that the juvenile court intended the parties to each have custody of the child on alternating weeks, beginning on Friday evening. The amended judgment further ordered that the child could not be withdrawn from the Haleyville school system without the express written consent of both parties. At the time of the first appeal, the child had been enrolled in a private religious school in Huntsville.
The amended judgment also included the following statement:
“It is to be noted that while the subject of the [mother’s] religious beliefs was brought up during the trial of the above-styled cause the court has not decided this case based upon the religious beliefs of either of the parties to this action. While it is true that there is considerable difference in religious beliefs between the parties, this court does not find it appropriate, legally or otherwise, to base its decision on whether or not the court agrees or disagrees with either of the party’s religious beliefs.”
The mother now appeals from the amended judgment. She contends that the juvenile court erred in determining that a change in custody would materially promote the child’s best interest. She does not challenge the provision in the amended judgment requiring the child to remain enrolled in the Haleyville school *328 system without the consent of both parties.[1]
As previously mentioned, the juvenile court based its decision on ore tenus evidence presented at the May 7, 2009, trial of this case. The standard of appellate review of a child-custody judgment based on ore tenus evidence is deferential.
“ ‘When evidence in a child-custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing.’ ”
Burgett v. Burgett, 995 So.2d 907, 912 (Ala.Civ.App.2008) (quoting Ex parte Bryowsky, 676 So.2d 1822, 1324 (Ala.1996)). An appellate court will not reverse a trial court’s judgment as to custody in such a case unless the evidence fails to support the trial court’s custody determination so that the appellate court must conclude that that determination is “ ‘plainly and palpably wrong.’ ” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1998)).
“ ‘[E]ven under the ore tenus rule, “[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.” ’ B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979)).”
Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala.Civ.App.2007).
In C.L.B., we set forth the following facts relevant to our determination of whether the evidence supported the juvenile court’s finding that the child was dependent:
“The mother and the father had the child out of wedlock. When the child was born, the mother was 16 years old and the father was 20 years old. On August 5, 2004, the juvenile court, incorporating an agreement of the parties, entered a judgment establishing the father’s paternity and awarding custody of the child to the mother. Pursuant to the parties’ agreement, the judgment granted visitation to the father and ordered him to pay child support.
“After the birth of the child, the mother went on to graduate from high school and college. The mother moved to Huntsville, without any objection from the father, and she is now a teacher in the Huntsville public schools. The record indicates that the parties had an amicable relationship, and they appeared to work well together in raising the child.
“In 2008, however, a dispute arose between the parties regarding the mother’s change in religious beliefs. The mother enrolled the child in a private school in Huntsville affiliated with the mother’s religious beliefs. The father filed a petition with the juvenile court seeking to modify custody of the child....
[[Image here]]
“The father testified that, until the parties’ religious differences arose, T *329 thought that [the mother] was one of the best mothers that I had ever met.’ Later, he testified that, although he did not believe that the mother had ‘made the right decision on the religion,’ he believed that she was ‘probably the best mom that I have ever met, as far as getting a bruise or cut on you, probably the best.’
“The juvenile court found that the child was ‘fearful’ of the mother’s husband. That finding is also not supported by the evidence. There was testimony indicating that the child was reluctant to talk about the mother’s husband in front of the father, but there was no evidence indicating that the child was afraid of the mother’s husband. The father testified that he did not believe that the mother would allow the child to be physically harmed. He also said that the mother’s new husband, who shares the mother’s religious beliefs, is ‘super nice’ and that he did not believe that the mother’s husband was harming the child.
“The juvenile court found that the mother’s move to Huntsville had had a negative impact on the child and that it had separated the child from his extended family. The record shows that the father did not object to the mother’s move to Huntsville. In fact, he stated that he understood that the mother had better job opportunities in Huntsville than in Winston County and that he was also interviewing for jobs outside of Winston County. The evidence was undisputed that the mother had invited her parents to visit in Huntsville, but, because of her religious beliefs, they had refused to visit her. The evidence also was undisputed that the child visited with both his paternal and his maternal grandparents every other weekend when he was at his father’s house for visitation.
“In its findings, the juvenile court stated that the mother had lived with her new husband for approximately ten months before they married. The evidence supported that finding. However, the juvenile court did not mention the undisputed evidence that, at the time of the hearing, the father was living with his girlfriend and her child.
“The evidence indicated that the child was doing well in school and that he was healthy, happy, and well-adjusted. There was no contention that the child was anything but well-cared for while in the mother’s custody. The father acknowledged that his only complaints against the mother were her religious beliefs and the fact that she had enrolled the child in the school affiliated with those beliefs. The father said that he wanted the child raised with the same religious beliefs with which he had been raised. The father said that he did not attend church more than a few times a year.”
C.L.B., 42 So.3d at 1247-49.
Because in this appeal we are reviewing whether the evidence is sufficient to support a finding that a change in custody was warranted under the standard set forth in Ex parte McLendon, we include the following additional facts adduced from the evidence.
As we stated in C.L.B., when the mother and the child moved to Huntsville, the mother enrolled the child in a school affiliated with her new religion. The child began first grade at the new school, but shortly after the school year began the child’s teacher contacted the mother with her concerns that the child was not yet ready for first grade. The child’s teacher told the mother that the child was frustrated because he was not keeping up with the other children and recommended that the *330 child repeat kindergarten. The mother said that, in addition to talking with the child’s first-grade teacher, she consulted with the child’s kindergarten teacher and then made the decision to have the child repeat kindergarten.
The father testified that he did not agree with the mother’s decision to hold the child back a year or with her choice of school for the child. He was concerned that the child was being instructed in the mother’s religion. The father believed that the child should be enrolled in public school. The mother was aware of the father’s concerns, but, she testified, she believed the child would receive a higher quality of education at the school in which she had enrolled him. She said that the student-to-teaeher ratio was approximately ten to one at the child’s school and that the teachers were able to spend more time with each child than teachers in the public schools, where she taught. The child’s first-grade teacher testified that she had taught in various school systems for 20 years. She said that, in her opinion, the curriculum at the child’s school provided students with a higher quality education than students in public schools received. She testified that the results of their students’ standardized tests supported her opinion.
The father acknowledged that the child seemed well adjusted and was “having a great time” at school. The father had visited the school once, and he said that he did not see anyone praying. The father presented no evidence regarding the education the child was receiving or any evidence indicating that the quality of education at the child’s school was lower than the quality of education the child would receive at a public school.
The mother testified that the child was not forced to take part in her religious activities. She said that, with the exception of certain minor food restrictions, the child’s day-to-day environment was the same as before the mother had changed religions. He still played with children in the neighborhood, he dressed like any other boy, his school uniform consisted of navy-blue pants and a white polo shirt, and, just as before the mother changed religions, he was not allowed to watch movies containing nudity or violence.
The father testified that he did not believe the child was being harmed in any way at home or at school, adding that the mother would not allow that. He also said that the mother had never put anything above the child’s welfare. He was worried, however, that the child would face “opposition” in life if he followed the mother’s religion.
The custody-modification standard set forth in Ex parte McLendon
“requires the parent seeking a custody change to demonstrate [ (1) ] that a material change in circumstances has occurred since the previous judgment, [ (2) ] that the child’s best interests will be materially promoted by a change of custody, and [ (3) ] that the benefits of the change will more than offset the inherently disruptive effect resulting from the change in custody.”
Dean v. Dean, 998 So.2d 1060, 1065 (Ala.Civ.App.2008).
The majority of the testimony at trial was about the mother’s change in religions. The evidence indicated that most of the parties’ family members disagreed with that change and with the child’s exposure to the mother’s religion at school. Otherwise, there was no assertion of a material change in circumstances warranting a custody modification. The father testified that he had not opposed the mother and child’s move to Huntsville. In fact, he said that he had interviewed for a job in *331 Huntsville. The mother had completed college and was working as a teacher in Huntsville. At the time of the trial, the mother was married; the father was living with his girlfriend. The father testified that the mother had never interfered with his visitation with the child. Although the child’s maternal grandparents had refused to visit the mother’s house in Huntsville after the mother converted to a new religion, the child saw them every other weekend when he was with the father. The evidence indicated that the school in which the mother had enrolled the child was providing the child with a high-quality education.
In Clift v. Clift, 346 So.2d 429 (Ala.Civ.App.1977), this court discussed the role a parent’s religious beliefs plays in a court’s determination of child custody. In Clift, this court stated:
“66 A.L.R.2d 1410,1413-14, states:
“ ‘[T]he view taken in the great majority of the decisions which have touched upon the matter seems to be that while the courts in a child custody proceeding cannot pass upon the comparative merits of various religions and controlling effect must be given to the temporal welfare of the child, religious questions may well be bound up in the issue of temporal welfare and, if so, may properly be considered by the court.’
“Similarly, it has been said:
“ ‘Religion may be an element in the award of custody of infants insofar as it remains a secondary factor to be considered along with all other circumstances weighed to promote the child’s best interest and general welfare; in no case may religion be the sole basis upon which a parent or other person is to be deprived of custody.’ (Religion — A Factor In Awarding Custody Of Infants, 31 S. Cal. L.Rev. 313, 319 (1958).)
“We deem this to be the applicable statement of the law.
“The Constitution guarantees that citizens of the United States shall be free to pursue the religious beliefs of their choice. Consonant with this First Amendment right, courts have repeatedly declared that religious beliefs alone shall not constitute the sole determinant in child custody awards. Mollish v. Mollish, Tenn.App., 494 S.W.2d 145 (1972); Sinclair v. Sinclair, 204 Kan. 240, 461 P.2d 750 (1969); Quiner v. Quiner, Cal.App., 59 Cal.Rptr. 503 (1967); Welker v. Welker, 24 Wis.2d 570, 129 N.W.2d 134 (1964); Frantzen v. Frantzen, Tex.Civ.App., 349 S.W.2d 765 (1961); Salvaggio v. Barnett, Tex.Civ.App., 248 S.W.2d 244 (1952), cert. denied, 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952); Jackson v. Jackson, 181 Kan. 1, 309 P.2d 705 (1957); Smith v. Smith, 90 Ariz. 190, 367 P.2d 230 (1961); Cory v. Cory, 70 Cal.App.2d 563, 161 P.2d 385 (1945); Stone v. Stone, 16 Wash.2d 315, 133 P.2d 526 (1943); Reynolds v. Rayborn, Tex.Civ.App., 116 S.W.2d 836 (1938).
“However, that one’s religious beliefs may not serve as the sole consideration in a child custody proceeding does not necessarily preclude exploration into those beliefs. In this state, as in other jurisdictions, the ultimate consideration in determining the proper custody of the child is what is in his best interests. Strickland v. Strickland, 285 Ala. 693, 235 So.2d 833 (1970); Williams v. Williams, 54 Ala.App. 703, 312 So.2d 396 (1975). Religious beliefs are as diverse as the individuals who comprise the citizenry of this country. Unfortunately, some of these beliefs embrace philosophies which, contrary to being in the best interests of the child, might actually *332 imperil his physical or mental health. Albeit courts are forbidden from weighing the merits of the religious tenets of the various faiths, they nevertheless are not precluded from inquiring into the beliefs of the parties who are seeking custody of the child in order to insure that such beliefs do not endanger the child.
“ ‘When custody of a child is in issue, the court has a narrow scope of inquiry regarding the religious concepts of the parents: Does the prospective custodian hold views which might reasonably be considered dangerous to the child’s health or morals? Thus a court would be warranted in denying custody to a parent whose religious notions would prevent such child’s receiving vaccinations or blood transfusions.’ (Welker; supra, 129 N.W.2d at 138).
“W[ere] the court prohibited from hearing all testimony regarding religious beliefs, it would never learn of any religious ideas which might reasonably be construed as inimical to the child. We hold that questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian’s convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding.”
Clift, 346 So.2d at 434-35; see also Ex parte Hilley, 405 So.2d 708 (Ala.1981).
In this case, the only evidence tending to show that the mother’s religious beliefs might cause harm to the child is the father’s testimony that he believes the child may face “opposition” if he follows the mother’s religion. There was no additional evidence presented to support the father’s assertion.
After reviewing the record, even giving proper deference to the juvenile court’s judgment, we cannot conclude that the father met the heavy burden imposed by Ex parte McLendon. The father did not provide evidence demonstrating that the child’s best interests would be materially promoted by a change of custody or that the benefits of such a change would more than offset the inherently disruptive effect resulting from the change.
For the reasons set forth above, we conclude that the juvenile court’s amended judgment modifying custody is plainly and palpably wrong. Therefore, the amended judgment is reversed, and the cause is remanded for the juvenile court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
BRYAN and MOORE, JJ., concur in the result, without writings.

. In the mother's response to the father’s motion for pendente lite custody, she stated that she had tendered her resignation from her teaching position in Huntsville and that she intended to remain in Haleyville at least through the 2009-2010 school year. She also stated that the father had taken a job in Huntsville.